# IN THE SUPERIOR COURT

# OF THE STATE OF DELAWARE

THE CHEMOURS                )
COMPANY TT, LLC             )
                            )
      Plaintiff,            )
                            )
v.                          )  C.A. No. N15C-03-083 WCC CCLD
                            )
ATI TITANIUM LLC,           )
                            )
      Defendant.            )

Submitted: June 3, 2016
Decided: July 27, 2016

**Plaintiff's Motion for Judgment on the Pleadings – DENIED**

**MEMORANDUM OPINION**

Michael P. Kelly, Esquire, Andrew S. Dupre, Esquire, McCarter & English LLP, 405 N. King Street, 8th Floor, Wilmington, DE 19801. Attorneys for Plaintiff.

Neal J. Levitsky, Esquire, Seth A. Niederman, Esquire, Fox Rothschild LLP, 919 North Market Street, Suite 300, Wilmington, DE 19899-2323. Attorneys for Defendant.

Jay D. Marinstein, Esquire, Patrick L. Abramowich, Esquire, Fox Rothschild LLP, 500 Grant Street, Suite 2500, Pittsburgh, PA 15219. Of Counsel Attorneys for Defendant.

**CARPENTER, J.**

Before the Court is a Motion for Judgment on the Pleadings filed by Plaintiff/Counterclaim Defendant, The Chemours Company TT, LLC ("Chemours"). The Motion relates to complex commercial litigation initiated by Chemours in March 2015 against Defendant/Counterclaim Plaintiff, ATI Titanium LLC ("ATI"). ATI has asserted various defenses and counterclaims in response to Chemours' Complaint. Having reviewed and considered the pleadings filed by the parties, in addition to briefing and oral argument in connection with the Motion, the Court will deny Chemours' Motion for Judgment on the Pleadings.

## I. BACKGROUND

This dispute arises out of a long-term titanium tetrachloride ("TiCl$_4$") supply agreement between Chemours and ATI ("Supply Agreement").[1] Chemours manufactures titanium dioxide ("TiO$_2$") pigment at its production facility in New Johnsonville, Tennessee.[2] ATI operates a titanium sponge plant in Rowley, Utah.[3]

TiCl$_4$ is a necessary component of titanium sponge and, in 2005, ATI approached Chemours about the possibility of purchasing its TiCl$_4$ requirements

---

[1] Pl. Compl. ¶ 12; Def. Countercl. ¶¶ 4-5. ATI and E.I. DuPont de Nemours and Company ("DuPont") were the original parties to the Supply Agreement. The Supply Agreement was assigned by DuPont to Chemours on February 18, 2015. As a result of the assignment, Chemours agreed to assume DuPont's liabilities and obligations relating to the Supply Agreement. DuPont and Chemours are referred to collectively throughout this Opinion as "Chemours." Pl. Compl. ¶ 13; Def. Countercl. ¶ 5.

[2] Pl. Compl. ¶ 7; Def. Answ. ¶ 7.

[3] Def. Countercl. ¶ 3.

2

from the New Johnsonville site.[4] The parties spent more than a year validating the technical feasibility of the arrangement and negotiating a long-term supply agreement.[5] While Chemours generated $TiCl_4$ as an intermediate product through its manufacture of $TiO_2$ pigment,[6] the processes it utilized were initially insufficient to produce $TiCl_4$ at the high quality level ATI required.[7] Once it completed capital improvements to the New Johnsonville Facility enabling it to satisfy ATI's quality requirements, Chemours agreed to supply the $TiCl_4$ to ATI.[8]

At the core of this dispute are the Supply Agreement's price terms. Under the Supply Agreement, ATI agreed to purchase minimum quantities of $TiCl_4$ or risk incurring substantial penalties.[9] The parties agreed to price the $TiCl_4$ on a per-pound basis and by calculating the sum of three "components"—the Non-Chlorine Materials Component, Chlorine Component, and Fixed Component—each of which would be adjusted periodically with reference to initial base prices.[10] Of most relevance to this litigation, the "Chlorine Component" represented "the

---

[4] Pl. Compl. ¶ 6; Def. Answ. ¶ 6. ATI intended at that time that the $TiCl_4$ would be used in connection with a new plant ATI planned to construct in Tooele County, Utah. *See id.*
[5] Pl. Compl. ¶¶ 8-10; Def. Answ. ¶¶ 8-10.
[6] Pl. Compl. ¶ 7 (noting that this requires "separating the Ti from titanium dioxide ores by reducing the ores with coke under a flow of chlorine at very high temperatures"); Def. Answ. ¶ 7.
[7] Pl. Compl. ¶ 8; Def. Answ. ¶ 8.
[8] *Id.*
[9] Supply Agreement §§ 3.2, 3.3.
[10] *Id.*, Schedule 2.1.

3

portion of the overall price of [TiCl$_4$] that is subject to the Chlorine Component Adjustment and that the parties…have agreed will be [28%] of the initial price of [TiCl$_4$]."[11] The "Chlorine Component Adjustment" was applied semiannually based on the percentage by which the "Chlorine Price" on the date of the adjustment was greater or less than the price of chlorine at the start of contract.[12] The Supply Agreement defines "Chlorine Price" as:

> [T]he weighted average price of chlorine delivered to [Chemours' New Johnsonville facility] and actually charged to [Chemours] by its suppliers over the previous six (6) months F.O.B. [Chemours'] facilities (as distinguished from contract prices for chlorine) plus average freight costs to the [New Johnsonville facility].[13]

As negotiations progressed, Chemours informed ATI that it was considering constructing a chlorine production facility on the New Johnsonville site in order to "mitigate risks" associated with the shipment of chlorine from off-site suppliers.[14] On July 26, 2006, a representative of Chemours allegedly emailed ATI advising that the definition of "Chlorine Price" include a clause requiring the parties to negotiate a new formula in the event Chemours pursued on-site chlorine production.[15] In response, ATI was allegedly adamant that any alternative pricing

---

[11] *Id.*, Art. 1.

[12] *Id.*, Art. 1,§ 2.3, Schedule 2.1

[13] *Id.*, Art. 1 (specifying adjustment timelines in terms of "July 1 to December 31 for the January 1 adjustment and January 1 to June 30 for the July 1 adjustment").

[14] Pl. Compl. ¶ 11; Def. Answ. ¶ 11.

[15] Def. Countercl. ¶ 7.

4

scheme (1) appear in the Supply Agreement; (2) exclude construction, start-up, and operation costs associated with the on-site facility; and (3) maintain the favorable chlorine prices Chemours obtained from off-site suppliers given its "substantial buying power as the United States' largest purchaser of chlorine."[16] ATI also proposed "Chlorine Price" be defined as "the lower of (i) Chemours' cost to produce chlorine at the On-Site Facility or (ii) the prevailing market price for chlorine available to Chemours."[17] According to ATI, unless "the issue of chlorine pricing for an On-Site Facility was expressly set forth in the Supply Agreement, or eliminated, ATI advised Chemours that [it] would not enter" the contract.[18] At the same time the parties were attempting to resolve issues relating to the definition of Chlorine Price, ATI was also allegedly insisting that the Supply Agreement incorporate a cap on periodic price adjustments.[19]

Representatives of ATI and Chemours met in Wilmington, Delaware on August 1, 2006 in an effort to address the issues that had arisen concerning the price terms of the Supply Agreement.[20] During the meeting, Richard Olson of Chemours allegedly represented to ATI that the on-site facility would not be

[16] *Id.* ¶ 8. *See also* Pl. Compl. ¶ 24; Pl. Reply Br. at 5-6.
[17] Def. Countercl. ¶ 9.
[18] *Id.* ¶ 10.
[19] *Id.* ¶ 11.
[20] *Id.* ¶ 12.

constructed during the term of the Supply Agreement and withdrew its demand for an alternative pricing provision.[21] In exchange for this representation, ATI allegedly withdrew its demand for a cap on the periodic price adjustments.[22] The relevant pricing provisions thus remained unchanged following the meeting and the Supply Agreement was subsequently executed on August 28, 2006.[23]

For approximately the first six years of the Supply Agreement, Chemours received shipments of chlorine from off-site suppliers, primarily by barge.[24] This arrangement purportedly resulted in favorable chlorine prices for Chemours, which were passed onto ATI by virtue of the Supply Agreement's Chlorine Component Adjustment.[25] However, in 2011, Chemours entered into a series of agreements with Occidental Chemical Corporation ("OxyChem") permitting OxyChem to build a chlor-alkali facility on the New Johnsonville site at an estimated construction cost of $250-290 million (the "On-site Facility").[26] Once complete, the OxyChem plant was intended to supply 100 percent of Chemours'

---

[21] *Id.* ¶ 13; Def. Opp'n to Pl. Mot. for J. at 42 ("[A]s the result of discovery and further investigation, ATI has been able to identify Rick Olson as the person who made the...statement.").

[22] Def. Countercl. ¶ 15 ("ATI was willing to rely on Chemours' purchasing power as the nation's largest buyer of chlorine to control price fluctuations.").

[23] Pl. Compl. ¶¶ 6, 12; Def. Answ. ¶¶ 6, 12. *See also* Def. Countercl. ¶ 4.

[24] Pl. Compl. ¶ 25; Def. Countercl. ¶ 21. *See also* Def. Opp'n to Pl. Mot. for J. at 12.

[25] Def. Countercl. ¶ 21.

[26] Pl. Compl. ¶ 26 (noting that the agreement with OxyChem also allowed OxyChem to utilize the New Johnsonville barge dock to "ship caustic soda produced there"); Def. Countercl. ¶ 22.

6

chlorine requirements for the New Johnsonville facility.[27] Chemours closed its barge dock around November 2012 to facilitate construction of the On-Site Facility and transitioned to the more costly alternative of receiving chlorine shipments by rail. [28]

In contrast to the below-market prices Chemours obtained during the first six years of the Supply Agreement, the Chlorine Price used to calculate the Chlorine Component Adjustment for the period of January 1, 2013 to June 30, 2013 allegedly increased by at least 14 percent.[29] According to ATI, when asked, Chemours attributed the increase to rail freight charges and assured ATI that the prices would drop once the On-Site facility was complete.[30]

In September 2013, OxyChem became Chemours' sole chlorine supplier, although chlorine could not be produced exclusively on-site until completion of the On-Site Facility.[31] During this time, significant increases in Chlorine Price persisted.[32] The periods of July 1, 2013 to December 31, 2013 and January 1, 2014 to June 30, 2014 revealed Chlorine Prices 51 and 39 percent higher than the

[27] Pl. Compl. ¶ 26.
[28] Def. Countercl. ¶ 25; Pl. Answ. to Def. Countercl. ¶ 25.
[29] Def. Countercl.¶ 27.
[30] *Id.* ¶ 28.
[31] Pl. Compl. ¶¶ 26-27.
[32] Def. Countercl. ¶¶ 29-30.

average historical below-market prices Chemours obtained in preceding years.[33] ATI again inquired about the price increase and Chemours continued to reassure ATI that the change in price was only temporary and that "the On-Site Facility would result in Chlorine Prices lower than those charged by off-site suppliers once [it] fully came online."[34]

The On-Site Facility became fully operational on May 1, 2014.[35] Despite Chemours' repeated assurances, the July 1, 2014 to December 31, 2014 period allegedly revealed a Chlorine Price 118 percent higher than the prices Chemours obtained from off-site suppliers during the first six years of the Supply Agreement.[36] This time when ATI questioned the increase, Chemours responded that the price of chlorine under its agreement with OxyChem switched from market-based to "cost-plus pricing," meaning that the sales price for chlorine supplied by the On-Site Facility "was calculated by adding OxyChem's variable and fixed costs for the month to a monthly margin…and then dividing the total by the …plant's actual production for the month."[37] Indeed, the On-Site Agreement

---

[33] *Id.*
[34] *Id.* ¶ 31.
[35] Pl. Compl. ¶¶ 26-27.
[36] Def. Countercl. ¶ 32.
[37] Pl. Compl. ¶ 28; Def. Answ. ¶ 28. *See also* Def. Countercl. ¶ 34; Pl. Answ. to Def. Countercl. ¶ 34 ("Per Section 4.2(b), DuPont and Chemours' sales price for chlorine supplied by the On-Site Facility is defined to equal the '(actual Plant Variable Costs + actual Plant Fixed Costs + Monthly Plant Margin) ÷ actual Plant Production.'").

expressly provided that "the...[Chemours] Sales Price is not based upon the market dynamics for Chlorine and Caustic Soda. Consequently, at times the...[Chemours] Sales Price . . . may be greater than the prevailing market price for Chlorine and Caustic Soda."[38] Under this pricing formula, the cost of caustic soda and the costs of constructing, starting, and operating the On-Site Facility were passed to ATI as part of the "Chlorine Price" used to calculate the Chlorine Component Adjustment.[39] Further, the "Plant Margin" component of the On-Site Agreement's formula provided OxyChem "'an internal rate of return equal to 15% on OxyChem's total investment in the Plant, which includes the investment required to supply...[Chemours'] Chlorine and Caustic Soda Requirements.'"[40] This margin was intended as a contractual "'incentive for OxyChem to invest in the construction and operation of the Plant to produce Product during the Initial Term.'"[41]

On August 27, 2014, ATI formally notified Chemours that it was disputing the July 2014 price adjustment.[42] According to ATI, the January-June 2015 period

---

[38] Def. Countercl. ¶ 36; Pl. Answ. to Def. Countercl. ¶ 36 (quoting Section 4.1(a)(3)(e) of the On-Site Agreement).
[39] Def. Countercl. ¶ 33; Pl. Answ. to Def. Countercl. ¶ 33.
[40] Def. Countercl. ¶ 35; Pl. Answ. to Def. Countercl. ¶ 35 (quoting Section 4.1(a)(3) of the On-Site Agreement).
[41] See id.
[42] Pl. Compl. ¶¶ 30-31.

reflected a Chlorine Price at least 122 percent higher than the below-market prices Chemours obtained from its off-site suppliers.[43] According to Chemours, ATI has since refused to pay approximately $2.7 million of the amounts invoiced from July 2014 through January 2015. [44]

As a result, on March 12, 2015, Chemours commenced the instant litigation seeking to recover the $2.7 million from ATI.[45] In its Complaint, Chemours claims it is entitled to damages from ATI for breach of contract and breach of the implied covenant of good faith and fair dealing.[46] Chemours also requests a declaratory judgment by the Court that:

> (i) the Supply Agreement is a valid and enforceable contract that remains in full force and effect; and (ii) ATI is required under the Supply Agreement to pay the full purchase price for $TiCl_4$ after July 1, 2014, as calculated by Chemours, with the Chlorine Adjustment Amount based on the price actually charged by OxyChem for chlorine delivered to the $TiCl_4$ production facility of Chemours at New Johnsonville.[47]

In response, ATI filed the operative Second Amended Answer, Affirmative Defenses, and Counterclaim on October 30, 2015. According to ATI, Chemours

---

[43] Def. Countercl. ¶ 43.
[44] Pl. Compl. ¶ 32.
[45] *Id.*
[46] *Id.* ¶¶ 40-50.
[47] *Id.* ¶ 39.

has no legal basis to require that ATI pay the amount sought in the Complaint.[48]

Additionally, ATI counterclaims for breach of contract, and alternatively, breaches of the obligation to act in good faith under the Delaware Uniform Commercial Code ("UCC") and/or the implied covenant of good faith and fair dealing, violation of 6 *Del. C.* § 2-305(2), and fraudulent inducement. ATI also seeks a declaration from the Court that:

(a)...Chemours' calculation of the Chlorine Price and Chlorine Component Adjustments beginning...effective January 1, 2013 through the present has breached and/or violated (i) the Supply Agreement, (ii)... 6 *Del. C.* § 2-305(2), (iii) ...[the] obligation of good faith under the Delaware Commercial Code, and/or (iv) the implied duty of good faith and fair dealing;

(b)...ATI does not owe Chemours any money for [$TiCl_4$] supplied...from January 1, 2013 to the present; and

(c) ...for the remaining term of the Supply Agreement, with respect to the Chlorine Price..., Chemours may charge ATI no more than the market prices that Chemours can obtain from offsite third-party chlorine suppliers in an arm's length negotiation (including reasonable freight costs to the...Production Facility).[49]

Chemours answered ATI's Counterclaim on November 19, 2015. Discovery in this matter is ongoing.

---

[48] Def. Answ. ¶ 32.
[49] Def. Countercl. at 2 (prayer for relief).

On January 20, 2016, Chemours filed the instant Motion for Judgment on the Pleadings pursuant to Superior Court Civil Rule 12(c). ATI submitted a brief opposing Chemours' request for judgment on the pleadings on February 26, 2016. A hearing was held on March 24, 2016, at the conclusion of which the Court reserved decision on the Motion.

## II. STANDARD OF REVIEW

Pursuant to Superior Court Civil Rule 12(c), any party may move for judgment on the pleadings after the pleadings are closed but within such time as not to delay trial.[50] However, "[t]he standard for granting a motion for final judgment on the pleadings is stringent,"[51] and the motion will be denied unless it is shown that no material issues of fact exist and the movant is entitled to judgment as a matter of law.[52] Importantly, a Court considering a motion for judgment on the pleadings must "view the facts pleaded and the inferences to be drawn from such facts in a light most favorable to the non-moving party."[53] Where

---

[50] Super. Ct. Civ. R. 12(c).

[51] *See Artisans' Bank v. Seaford IR, LLC*, 2010 WL 2501471, at *1 (Del. Super. June 21, 2010).

[52] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[53] *See id.* (citing *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962 (Del. Ch. 1989), *aff'd*, 567 A.2d 419 (Del. 1989)).

12

a document is integral to the pleadings, the Court may consider it in deciding a Rule 12(c) motion without converting it to one for summary judgment.[54]

## III. DISCUSSION

Chemours contends judgment on the pleadings is appropriate because (1) both parties assert that the Supply Agreement is unambiguous; (2) "ATI's overaggressive approach to non-party discovery is damaging Chemours' commercial relationships, for a case that can be readily adjudicated on the pleadings;" and (3) ATI's fraud claim fails to meet the requirements of Superior Court Civil Rule 9(b) and is "ripe for dismissal."[55] ATI responds that the Supply Agreement is silent regarding on-site chlorine and that the definition of Chlorine Price is, at a minimum, ambiguous.[56] Additionally, ATI asserts that, even if Chemours was allowed to use on-site chlorine under the Supply Agreement, ATI has properly alleged that Chemours engaged in fraudulent conduct and breached its good faith obligations under the UCC and the implied covenant of good faith and fair dealing.[57] ATI further maintains that the discovery adduced to date provides substantial support for its claims and characterizes Chemours' "mid-

---

[54] *See, e.g., Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004)).
[55] Pl. Mot. for J. at 3.
[56] Def. Opp'n to Pl. Mot. for J. at 2-3.
[57] *Id.* at 3.

13

discovery Motion [a]s an attempt to shield…key evidence from the Court's consideration."[58]  As a result, ATI asks that the Court deny the instant Motion.

## A. Breach of Contract

Chemours maintains this matter is ripe for adjudication under Rule 12(c) because both parties acknowledge that the Supply Agreement is "unambiguous."[59] In Delaware, "judgment on the pleadings is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact."[60]  The issue for the Court, then, is to decide whether the Supply Agreement "is in any way ambiguous, by determining whether the 'provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"[61]

Under the express language of the Supply Agreement, Chemours agreed to sell and ATI promised to purchase certain quantities of $TiCl_4$ at a price which included an adjustable Chlorine Component. The Chlorine Component represented

---

[58] *Id.* at 4.

[59] Pl. Reply Br. at 2-3.

[60] *Aveta Inc. v. Bengoa*, 2008 WL 5255818, at *2 (Del. Ch. Dec. 11, 2008) (quoting *Lillis v. AT & T Corp.*, 904 A.2d 325, 330 (Del. Ch. 2006)).

[61] *See Lillis v. AT & T Corp.*, 904 A.2d at 330 (quoting *Rhone-Poulenc Basic Chems. v. American Motorists Ins.*, 616 A.2d 1192, 1196 (Del. 1992). *See also Gore v. Al Jazeera Am. Hldgs. I, Inc.*, 2015 WL 4778339, at *6 (Del. Ch. Aug. 13, 2015) ("According to the law of Delaware, . . .the Court will give binding effect to contract language where that language is plain and unambiguous. Contract language is ambiguous only where it is 'susceptible to two or more reasonable interpretations.'").

28 percent of the Initial Base Price, or the price of TiCl$_4$ on the date of the Supply Agreement's execution, and would be adjusted semiannually based on the price of chlorine to Chemours.[62] The Supply Agreement defines "Chlorine Price" as:

> [T]he weighted average price of chlorine delivered to [Chemours's New Johnsonville facility] and actually charged to [Chemours] by its suppliers over the previous six (6) months…F.O.B. [Chemours's] facilities (as distinguished from contract prices for chlorine) plus average freight costs to the [New Johnsonville facility].[63]

According to Chemours, the language "actually charged" unambiguously identifies Chlorine Price as the *actual price* paid by Chemours to its suppliers, without any reference to market pricing and without prescribing certain suppliers or modes of delivery.[64] As such, Chemours asserts that it properly applied the invoices it received from OxyChem to the Chlorine Price and ATI's refusal and failure to pay the full TiCl$_4$ purchase price as calculated by Chemours beginning July 1, 2014 constitutes a breach of the Supply Agreement.[65] ATI, on the other hand, contends the language of the Supply Agreement—as supplemented and interpreted by course of performance, trade usage, and Chemours' extra-contractual representations—unambiguously reflects the parties' intent that

---

[62] Supply Agreement §§ 2.1, 2.3, Schedule 2.1.
[63] *Id.*, Art. 1.
[64] Pl. Mot. for J. at 14 ("If OxyChem charged Chemours $300/ton for chlorine, than Chemours would charge ATI $300/ton for chlorine within the…pricing formula."); Pl. Reply Br. at 3.
[65] Pl. Compl. ¶¶ 41-44; Pl. Reply Br. at 1, 14-15.

15

Chemours would obtain chlorine from off-site suppliers.[66] ATI thus maintains it was justified in not paying the full price and counterclaims that Chemours, by sourcing chlorine from the On-Site Facility and structuring the contract with OxyChem, breached the pricing terms of the Supply Agreement.[67]

At the outset, it is clear to the Court that the Supply Agreement does not expressly prohibit Chemours from obtaining chlorine from an on-site supplier. It is also clear, however, that the contract's pricing provisions are replete with terms

---

[66] Def. Opp'n to Pl. Mot. for J. at 20.

[67] Def. Countercl. ¶ 50. In particular, ATI maintains Chemours breached Sections 2.1, 2.3 and Schedule 2.1 of the Supply Agreement by:

> (a) sourcing chlorine from an on-site supplier, contrary to the parties' intent and agreement for Chemours (i) to obtain chlorine from off-site suppliers and (ii) to incur freight costs to have the chlorine transported from Chemours' off-site suppliers to Chemours' Titanium Tetrachloride Production Facility; and/or
> (b) calculating the Chlorine Component Adjustments effective January 1, 2013, and continuing to the present, based upon the costs incurred to fund OxyChem's guaranteed 15% rate of return on investment (*i.e.* Plant Margin) and the construction, start-up, and/or operation of an On-Site Facility at the Titanium Tetrachloride Production Facility, including without limitation the costs resulting from the closure of the barge dock, rather than negotiating an arm's length market price available to Chemours for chlorine delivered to the Titanium Tetrachloride Production Facility by Chemours' off-site suppliers over the preceding six (6) month period; and/or
> (c) imposing a Chlorine Component surcharge for the costs incurred to fund OxyChem's guaranteed 15% rate of return on investment (*i.e.* Plant Margin) and the construction, start-up, and operation of an On-Site Facility at the Titanium Tetrachloride Production Facility, which is not authorized by the Supply Agreement; and/or
> (d) in the alternative, to the extent that the Supply Agreement authorized Chemours to source chlorine from an on-site supplier, which ATI denies, negotiating an On-Site Supply Agreement with OxyChem that calculates the price of chlorine utilizing (i) OxyChem's blended costs to produce chlorine and caustic soda, and/or (ii) a single price for chlorine and caustic soda, such that the Chlorine Price used to calculate the Chlorine Component Adjustments does not provide a true delivered price for chlorine.

*Id.*

16

tending to indicate that the Supply Agreement was drafted with the expectation that the Chlorine Component of the contract price would be calculated according to the price Chemours paid to off-site suppliers for chlorine delivered to the New Johnsonville Facility plus "average freight costs."[68] If that were not the case, anyone equipped with even the most basic understanding of commercial transactions would struggle to understand why, then, such sophisticated parties felt the need to include in the definition of Chlorine Price language such as "price of chlorine delivered to [Chemours'] Facility," "F.O.B. [Chemours'] facilities," or "plus average freight costs to [Chemours'] Facility."[69]

Despite the Court's impression that the possibility of on-site chlorine production is not specifically addressed in the terms of the Supply Agreement, it refuses to find that the contract *required* Chemours to obtain chlorine exclusively from off-site suppliers. The Court agrees with Chemours that the term "delivered" cannot be read to mandate delivery via rail or barge as opposed to by pipeline and that the allowance for freight costs served "[a]s an entitlement benefitting Chemours when it did incur such expenses," rather than "a limitation on its future supply arrangements."[70] Absent any language connoting restriction, the Court is

---

[68] Supply Agreement, Art. 1.
[69] *See id.*
[70] Pl. Reply Br. at 9; Pl. Mot. for J. at 22 (claiming that the latter would be a "major material change to the Contract").

17

unwilling to accept as reasonable ATI's interpretation that the definition of Chlorine Price imposed a contractual obligation on the nation's largest purchaser of chlorine to obtain its chlorine from off-site suppliers alone.

The fact that the $TiCl_4$ delivered to ATI under the Supply Agreement ultimately came to be created using chlorine supplied on-site does not excuse ATI's obligation to pay for the $TiCl_4$ it received. That obligation, however, cannot extend to amounts charged in violation of the implied covenant of good faith and fair dealing, the open-price provisions of the UCC, or through fraudulent conduct. As discussed further below, a material issue remains, given the allegations set forth in ATI's counterclaim as to whether Chemours' conduct leading up to the Supply Agreement's execution and in structuring the On-Site Agreement resulted in commercially unreasonable prices, breached its good faith obligations, and/or amounted to fraudulent inducement.

If the Court were to accept Chemours' position, it would have to rule that the Supply Agreement gave Chemours unfettered discretion to purchase chlorine at any price and to pass that cost onto ATI. While the Court finds that the contract requires payment for $TiCl_4$ purchased, it is unwilling at this juncture of the litigation to find that ATI was required to simply accept any potentially unreasonable price caused by Chemours' contractual relationship with its

18

suppliers. If ATI's assertions are correct, this was an incredible deal for Chemours and OxyChem. They could build a plant and pass on not only the cost of the chlorine, but the cost of building the plant, to a third party. If true, it is hard to imagine a more fitting example of the scenarios to which the concept of good faith and fair dealing generally applies in order to prevent a contract from producing unconscionable outcomes. From a purely contractual standpoint, ATI owes Chemours for the $TiCl_4$ it received pursuant to the Supply Agreement. The only issue, then, is what constitutes a reasonable price for the product purchased. I make this comment to inject some reasonableness into this litigation. The Court is denying Chemours' Motion at this juncture, but reasonable business people making reasonable business decisions should resolve this issue.

## B. Breach of 6 *Del. C.* § 2-305(2)

In Count II of its Counterclaim, ATI asserts that, beginning January 1, 2013, Chemours failed to fix the Chlorine Prices used to calculate the Chlorine Component Adjustment in good faith, as required by 6 *Del. C.* § 2-305(2).[71] Chemours responds that ATI's claim must fail because § 2-305 does not apply to the Supply Agreement.

---

[71] Def. Countercl. ¶ 61.

19

Section 2-305 of the UCC governs "open price terms" in contracts for the sale of goods and is applicable "when the price term is left open on the making of an agreement which is nevertheless intended by the parties to be a binding agreement."[72] Pursuant to § 2-305(2), "[a] price to be fixed by the seller...means a price for him or her to fix in good faith."[73] The UCC commentary explains that this provision intends to "reject[] the uncommercial idea that an agreement that the seller may fix the price means that he [or she] may fix any price he [or she] may wish..."[74] "Good faith" is defined under § 2-305 to "include[] observance of reasonable commercial standards of fair dealing in the trade if the party is a merchant."[75] Additionally, "in the normal case a 'posted price' or a future seller's or buyer's 'given price,' 'price in effect,' 'market price,' or the like satisfies the good faith requirement."[76] "An open price term that is not set in good faith gives rise to a cause of action for breach of the underlying contractual open-price

---

[72] 6 *Del. C.* § 2-305, cmt. 1.
[73] *Id.* § 2-305(2).
[74] *Id.* § 2-305, cmt. 3 ("Subsection (2)...rejects the uncommercial idea that an agreement that the seller may fix the price means that he may fix any price he may wish by the express qualification that the price so fixed must be fixed in good faith."). *See also Stephenson Oil Co. v. Citgo Petroleum Corp.*, 2010 WL 2998604, at *4 (N.D. Okla. July 28, 2010) ("The duty to set open price terms in good faith 'acts to preserve and control opportunistic behavior by requiring that the price be reasonable and set pursuant to reasonable commercial standards of fair dealing in the trade.'" (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1308, 1319 (S.D.Fla.1999))).
[75] § 2-305, cmt. 3 (internal citation omitted) (citing § 2-103 with respect to merchants).
[76] *Id.*

provision rather than an independent cause of action."[77]   Nevertheless, where an

agreement reflects a price to be "set according to a particular standard, [§] 2-305

has no role to play."[78]

According to Chemours, the Supply Agreement reflects a "detailed,"

"highly negotiated," and "express standard" by which the price of $TiCl_4$ was

determined, rendering 6 *Del. C.* § 2-305(2) inapplicable.[79]   To accept this

argument, however, would be to ignore the fact that the Chlorine Component of

the $TiCl_4$ price was subject to semi-annual adjustment as calculated according to

whatever price Chemours agreed to pay the chlorine supplier(s) of its choice.[80] The

---

[77] *See Stephenson Oil Co,* 2010 WL 2998604, at *4 (stating that *Allapattah* explains "that good faith is an interpretive tool to determine the parties' expectations under the contract and does not create an independent duty divorced from the specific clauses of the contract").

[78] *See Kellam Energy, Inc. v. Duncan,* 668 F. Supp. 861, 877 (D. Del. 1987) (excluding parol evidence).

[79] Pl. Mot. for J. at 30-31. Chemours cites *Dairyland Power Co-op v. Amax, Inc.* in support of its position. 700 F. Supp. 979 (W.D. Wis.1986). The *Dairyland* court acknowledged that, normally "a contract that sets prices according to a detailed price adjustment mechanism tied to specific cost factors does not implicate the open price provisions of UCC § 2–305." *See id.* at 990 (acknowledging also that "certain events during the term of a price adjustment contract may operate to unsettle the contract price"). That case involved a contract which indisputably set a "definite price" for coal, but subjected the set price to revision "under two separate schemes," including a renegotiation provision. *See id.* at 991. The Court was "not persuaded by plaintiff's argument that its renegotiation request rendered the price of coal open within the meaning of UCC § 2–305" because the contract specifically "provide[d] for the possibility that the parties may fail to reach an agreement" as to the negotiated price and addressed the precise "potential outcome" that the seller could "continue supplying coal under the terms of the contract without any revision in price." *See id.* Unlike the contract in that case, however, the Supply Agreement does not provide "specific cost factors" or an alternative pricing scheme that expressly controls in the event Chemours's transitioned to an on-site chlorine supplier.

[80] Def. Opp'n to Pl. Mot. for J. at 34-35.

21

Supply Agreement clearly required ATI to pay a price which was, in large part, subject to variation within Chemours's control.[81] As such, Chemours was obligated under § 2-305 "to act in good faith with respect to fixing the price of chlorine."[82]

Having found § 2-305 applicable, the Court turns to ATI's allegations. According to ATI, for the first six years of the contract, Chemours obtained Chlorine Prices "that averaged at least 30 percent below [the] prevailing market rates,"[83] but these prices increased significantly once construction commenced on the On-Site Facility.[84] ATI attributes this increase to Chemours' failure, beginning in January 2013, to exercise its price fixing power in good faith by unreasonably (1) closing its barge dock to construct the On-Site Facility and passing significantly higher rail freight charges onto ATI;[85] (2) selecting an on-site supplier of chlorine contrary to its representation during negotiations;[86] (3)

---

[81] *See* 2A Anderson U.C.C. § 2-305:52 (3d. ed.) (noting the open price provisions apply "when the buyer pays in terms of a price which is to vary within the seller's control" and consequent to that duty, "if a price increase is authorized in terms of a percentage of the seller's increased costs, the seller must act in good faith with respect to costs and cost accounting methods" meaning "the seller cannot 'load' new cost items on the contract, as for example, by purchasing new machinery which will outlive the life of the particular contract while charging the entire purchase price to the particular contract's costs").

[82] *See id.*

[83] Def. Countercl.¶ 21.

[84] *Id.* ¶¶ 26-33.

[85] *Id.* ¶ 59(a).

[86] *Id.* ¶ 59(b).

negotiating and entering the On-Site Agreement with OxyChem;[87] and/or (4) "denying ATI any financial benefits from the...On-Site Facility by terminating the Supply Agreement effective December 31, 2015."[88]

According to ATI, the On-Site Agreement was structured so that ATI would effectively fund not only the On-Site Facility's construction and operation, but also OxyChem's guaranteed 15 percent rate of return.[89] Further, ATI alleges that it was not charged the "true delivered price of chlorine" because OxyChem was able to pass its blended costs of chlorine *and* caustic soda onto ATI.[90] The arrangement allegedly resulted in significantly higher Chlorine Component charges to ATI under the Supply Agreement than would have occurred had

---

[87] *Id.* ¶ 59(c)-(j), (l). Specifically, ATI claims Chemours breached the open price provisions by "choosing not to negotiate an arm's length market price available to Chemours for chlorine with OxyChem" and entering the On-Site Agreement, which:

> (c) ... require[d] ATI to pay OxyChem's construction, start-up, and operating costs; and/or (d)... require[d] ATI to pay OxyChem's guaranteed 15% rate of return...(i.e. Plant Margin); and/or (e) ... required ATI to pay OxyChem's blended costs to produce chlorine and caustic soda...; and/or (f) ...calculates the price of chlorine utilizing a single price for chlorine and caustic soda, such that the Chlorine Price...does not provide a true delivered price for chlorine; and/or (g) ...incorporates the Improper Caustic Soda Subsidy, which Chemours knew would persist for the remaining term of the ATI Supply Agreement, such that the Chlorine Price...does not provide a true delivered price for chlorine; and/or (h) ... failed to effectively mitigate disparities between the prices for chlorine charged by OxyChem and market prices for chlorine and caustic soda; and/or (i)...allows OxyChem to charge commercially unreasonable prices for chlorine; and/or (j) ... produced Chlorine Prices...substantially and materially greater than...prices...Chemours...obtained for its other facilities....

[88] *Id.* ¶¶ 59(m), 60.
[89] *Id.* ¶ 59(c)-(h).
[90] *Id.*

23

Chemours engaged in "arm's length market transactions."[91] The amount

Chemours agreed to pay OxyChem is also alleged to be "substantially and

materially greater" than the chlorine prices paid by Chemours for "its other

facilities."[92] Ultimately, ATI contends Chemours' conduct resulted in

commercially unreasonable and uncompetitive Chlorine Prices and denied ATI the

benefit of the Supply Agreement.[93]

---

[91] *Id.* ¶ 59(k).
[92] *Id.* ¶ 59(j).
[93] Def. Opp'n to Pl. Mot. for J. at 36-38. ATI claims Chemours "received benefits from the On-Site Facility that were not shared in any respect with ATI, including,
but not limited to the following:"

(a) While Chemours anticipated that, starting in the fifth year of operation of the On-Site Facility, costs for chlorine would be less expensive than chlorine obtained from off-site suppliers, Chemours knew that chlorine obtained from an On-Site Facility would be significantly more expensive than chlorine from offsite suppliers during the first four years of the On-Site Facility, which encompassed the entire remaining term of the Supply Agreement. Accordingly, only Chemours stood to benefit from obtaining future favorable pricing from the On-Site Facility at ATI's expense.

(b) Chemours received multi-million dollar price concessions from chlorine suppliers to supply chlorine to Chemours' other facilities as a result of entering into the On-Site Supply Agreement with OxyChem. None of these price concessions benefitted ATI and were at ATI's expense, as the Chlorine Price was based solely on the price of chlorine obtained from the On-Site Facility.

(c) The On-Site Facility enabled Chemours to pursue a program to sell salt brine to OxyChem and close its salt plant, thereby providing Chemours with expected savings of millions of dollars in annual operating expenses, deferring and/or avoiding millions of dollars in maintenance expenses, and avoiding $20 million in capital investment. ATI received no benefit from Chemours selling salt brine to OxyChem and potentially closing its salt plant.

(d) Chemours received caustic soda prices under the On-Site Supply Agreement that were below prevailing market prices for caustic soda. ATI did not receive any benefit from the below market caustic soda prices obtained by Chemours. To the contrary, ATI has borne the cost of the Improper Caustic Soda Subsidy through increased Chlorine Prices used to calculate the Chlorine Component Adjustments.

Def. Countercl. ¶ 60.

Accepting the allegations of ATI's Counterclaim as true and drawing all reasonable inferences in its favor, the Court concludes ATI has stated a claim for breach of contract pursuant to 6 *Del. C.* § 2-305(2). At this stage, it would be premature for the Court to render a decision as to the commercial reasonableness of and/or good faith/ bad faith conduct underlying Chemours' pricing of ATI's $TiCl_4$.[94]

## C. Breach of the Implied Covenant

In Delaware, the implied covenant of good faith and fair dealing inheres in every contract and mandates that parties thereto "refrain from arbitrary or unreasonable conduct" that would prevent "the other party…from receiving the fruits of the[ir] bargain." [95] The implied covenant applies only when "a contract is silent as to the issue in dispute,"[96] and, therefore, is generally "triggered when the defendant's conduct does not violate the express terms of the agreement but nevertheless deprives the plaintiff of the fruits of the bargain."[97] In effect, the

[94] *See Desert Equities, Inc.,* 624 A.2d at 1206-09 (emphasizing that fairly pleaded allegations of bad faith and/or unreasonableness essentially raise "question[s] of fact which generally cannot be resolved on the pleadings").

[95] *See Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del. 2005) (internal quotation omitted).

[96] *See In re Conex Hldgs., LLC,* 518 B.R. 792, 803 (Bankr. D. Del. 2014) (quoting *AQSR India Private, Ltd. v. Bureau Veritas Hldgs., Inc.,* 2009 WL 1707910, at *11 (Del. Ch. June 16, 2009)). *See also Kuroda v. SPJS Hldgs., L.L.C.,* 971 A.2d 872, 888 (Del. Ch. 2009) (recognizing that the implied covenant cannot be utilized to supersede a contract's express terms).

[97] *See Amirsaleh v. Bd. of Trade of City of New York, Inc.,* 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) (citing *Chamison v. HealthTrust, Inc.-Hosp. Co.,* 735 A.2d 912, 920

25

implied covenant is best characterized "as a judicial tool used to imply terms in a contract that protect the reasonable expectations of the parties [there]to."[98] Our Courts have emphasized that the implied covenant of good faith and fair dealing assumes a particularly important role in cases involving "contracts that defer a decision at the time of contracting and empower one party to make that decision later."[99] When a contract confers discretionary rights upon a party, the implied covenant demands that the discretion be exercised reasonably and in good faith.[100] An analysis of "what is 'arbitrary' or 'unreasonable'...depends on the parties' original contractual obligations and reasonable expectations at the time of contracting."[101] Fairly pleaded allegations of bad faith and/or unreasonableness essentially raise "question[s] of fact which generally cannot be resolved on the pleadings."[102]

ATI relies on essentially the same conduct alleged in its counterclaim for breach of § 2-305 to support its implied covenant claim, with added focus on

(Del.Ch.1999), *aff'd*, 748 A.2d 407 (Del.2000)); *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146 (Del. Ch. 2009) (noting that the implied covenant "operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit answer").

[98] *See Amirsaleh*, 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) (quoting *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del.1996)).

[99] *See id.* at *5 (citation omitted).

[100] *See Airborne Health, Inc.*, 984 A.2d at 146-47 (citation omitted).

[101] *See In re Encore Energy P'rs LP Unitholder Litig.*, 2012 WL 3792997, at *12 (Del. Ch. Aug. 31, 2012) (internal quotation marks omitted) (citations omitted).

[102] *See Desert Equities, Inc.*, 624 A.2d at 1206-09.

26

Chemours' exercise of discretion under the Supply Agreement. In other words, ATI's claims that, to the extent the contract does not bar Chemours' use of on-site chlorine, Chemours exercised its discretion to select its chlorine suppliers, negotiate chlorine price and shipment terms, and structure the On-Site Agreement *unreasonably*.[103] ATI argues Chemours entered and structured the On-Site Agreement solely for its own benefit and failed to consider preserving ATI's benefit of the bargain under the Supply Agreement.[104]

Chemours responds that ATI's counterclaim is defeated by the Supply Agreement's express terms and ATI's allegations with respect to its negotiation and drafting history.[105] Chemours emphasizes that the implied covenant involves "inferring contractual terms to handle developments or contractual gaps that the asserting party pleads *neither party anticipated*."[106] Because ATI alleges that on-site chlorine was a hotly contested issue that the parties actually negotiated, Chemours argues ATI cannot rely on the implied covenant to secure additional terms that "were rejected during negotiations or easily could have been included at the time of contracting."[107] According to Chemours, ATI is properly limited to the

---

[103] Def. Countercl. ¶ 52.
[104] *Id.* ¶¶ 53-54.
[105] Pl. Mot. for J. at 26.
[106] *Id.* (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).
[107] *Id.* at 27.

27

express price protections for which it did successfully negotiate, such as the Supply Agreement's Economic Force Majeure provision and Chemours' guarantee that it would not charge ATI a price for $TiCl_4$ higher than that charged to other Chemours' customers.[108]

The Court declines to accept Chemours' position. Under the Supply Agreement, Chemours was able to choose where it sourced its chlorine from and to freely negotiate the terms of its contracts with its chosen suppliers. In exercising that discretion, Chemours was required to act reasonably and in good faith. Based on ATI's allegations and the contents of the Supply Agreement, the concept of ATI funding the construction and operation of Chemours' On-Site Facility seems entirely unanticipated and unexpected by the parties. In fact, ATI may conceivably prove that Chemours represented that no on-site facility would be constructed during the life of the Supply Agreement. Under such circumstances, that Chlorine Price would come to include the costs of on-site production seems not only unexpected and unanticipated, but a development Chemours affirmatively removed from the bargaining table.

ATI alleges Chemours structured the On-Site Agreement solely for its own financial benefit which resulted in commercially unreasonable and uncompetitive

---

[108] *Id.* at 28. *See also* Supply Agreement §§ 7.3, 11.2.

chlorine prices for ATI. This conduct, if established, deprived ATI of the benefit of its bargain. Whether Chemours breached its good faith obligations in exercising the discretion it was granted under the Supply Agreement thus remains to be determined and prevents the Court from granting Chemours' Motion.

## D. Fraudulent Inducement

To establish fraudulent inducement, ATI is required to plead facts supporting the inference that (1) Chemours made "a false representation, usually one of fact;" (2) Chemours knew its "representation was false, or was made with reckless indifference to the truth;" (3) Chemours intended to induce ATI "to act or to refrain from acting;" (4) ATI's action or inaction was "taken in justifiable reliance upon the representation;" and (5) damage to ATI as a result of such reliance.[109]

Here, ATI's Counterclaim alleges certain ATI representatives met with Richard Olson, Gerald Colamarino, John Pritchard, and Norman Griffiths of Chemours at Chemours' Wilmington office on August 1, 2006.[110] A Chemours representative, who ATI was later able to pinpoint as Olson, allegedly represented to ATI at the meeting that the On-Site Facility would not be constructed during the

---

[109] See Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del.1992).
[110] Def. Countercl.¶¶ 12, 64; Def. Opp'n to Pl. Mot. for J. at 42.

term of the Supply Agreement.[111] According to ATI, Chemours knew Olson's representation was false, or at the very least that it was made with reckless indifference to the truth, at the time it was made to ATI.[112] ATI's Counterclaim states that Chemours has since admitted in this litigation that, at the time of the August 1, 2006 meeting and the Supply Agreement's execution, Chemours planned to have the On-Site Facility constructed "some time during the period of September 1, 2006 and December 31, 2015."[113] ATI maintains it justifiably relied on Olson's representation and was "fraudulently induced…to drop its demand for a 10 percent cap on price increases and enter into the Supply Agreement."[114] Had ATI been aware that Chemours' statement was false, it would have demanded the Supply Agreement "include a specific alternative pricing formula for chlorine produced by an On-Site Facility" that would preclude Chemours from passing on its construction, start-up, and operating costs.[115] ATI also claims it would have sought assurance from Chemours that the "On-Site Facility would not increase the highly-favorable chlorine prices…Chemours…obtain[ed] from off-site suppliers as the United States' largest purchaser of chlorine."[116] Characterizing Chemours'

---

[111] *Id.*
[112] Def. Countercl. ¶ 65.
[113] *Id.* ¶ 14.
[114] *Id.* ¶ 67.
[115] *Id.* ¶ 68.
[116] *Id.*

30

conduct as "malicious, wanton, and undertaken with reckless indifference to ATI's rights," ATI seeks punitive damages in connection with its fraud claim.[117]

Chemours asserts that ATI's fraud claim must fail because it (1) does not satisfy the particularity requirements of Superior Court Civil Rule 9(b) and (2) is barred by the Supply Agreement's integration clause.[118] Chemours' particularity argument relates to ATI's failure to specify in its Second Amended Counterclaim which of the three Chemours' representatives it met with on August 1, 2006 made the allegedly fraudulent statement, as required by Rule 9. Given that Chemours was able to file its answer to ATI's Counterclaim and that ATI has since identified Olson as the speaker, the Court finds Chemours' has adequate notice of ATI's fraud claim.

Chemours also contends ATI's fraud claim must fail because the Supply Agreement's integration provision precludes justifiable reliance. Section 13.5 of the Supply Agreement is entitled "Entire Agreement" and provides that the contract "constitutes the entire agreement between the parties with respect to the matters specified in this Agreement and supersedes all of their prior and contemporaneous agreements, understandings, negotiations, inducements,

---

[117] *Id.* ¶¶ 69-70.
[118] Pl. Mot. for J. 17-18.

31

representations, or conditions, whether oral or written, whether express or implied, with respect to the matters specified herein."[119] ATI responds that Chemours's argument ignores the distinction Delaware law draws between anti-reliance and integration provisions, maintaining the latter is insufficient to preclude justifiable reliance.[120]

Generally, "when sophisticated parties include a broad but unambiguous anti-reliance clause in their agreement," Delaware courts will "indulge the assumption that they said what they meant and meant what they said."[121] Whether certain provisions of a contract will operate to foreclose a party's reliance on extra-contractual representations often depends on the precise language utilized in the agreement. Delaware law does not require contracting parties incorporate specific language or "magic words" to disclaim reliance.[122] Rather, courts will inquire whether the contract, when read cohesively, can be said to contain an unambiguous and explicit statement by the aggrieved party that it did not rely on

[119] Supply Agreement § 13.5.
[120] Def. Opp'n to Pl. Mot. for J. at 43.
[121] See MBIA Ins. Corp. v. Royal Indem. Co., 426 F.3d 204, 218 (3d Cir. 2005).
[122] See FdG Logistics LLC v. A&R Logistics Hldgs., Inc., 131 A.3d 842, 860 (Del. Ch. 2016)(citing Prairie Capital III, L.P. v. Double E Hldgs. Corp. 2015 WL 7461807 (Del. Ch. Nov. 24, 2015)).

representations made outside of the contract's four corners in deciding to enter the agreement.[123]

As ATI correctly points out, the presence of a standard integration clause will not alone suffice to preclude justifiable reliance.[124] Chemours argues the Delaware Court of Chancery's decision in *Blackhorse Capital* stands for just the opposite proposition. The Court disagrees. Section 13.5 states in general terms that the Supply Agreement constitutes the entire agreement between the parties.[125] It does not unambiguously disclaim reliance on extra-contractual statements. Further, the clause plainly extends only to "the matters specified" within the Supply Agreement. This is not a case where the alleged extra-contractual

---

[123] *See id.* ("The language to disclaim such reliance may vary, as the Court noted in *Prairie Capital,* but the disclaimer must come from the point of view of the aggrieved party (or all parties to the contract) to ensure the preclusion of fraud claims for extra-contractual statements under *Abry* and its progeny"). *See also In re Med. Wind Down Hldgs. III, Inc.*, 332 B.R. 98, 105-06 (Bankr. D. Del. 2005) (recognizing that a contract "need not necessarily contain the words 'rely' or 'reliance;' but such provisions must 'clearly' and 'explicitly' promise not to rely"); *Kronenberg v. Katz,* 872 A.2d 568, 591 (Del.Ch. 2004) (refusing to give integration clause effect of anti-reliance where language failed to "forthrightly affirm" that the parties were not relying on any representation or statement not contained in the agreement), *aff'd without op.,* 867 A.2d 902 (Del.2005); *Abry P'rs V, L.P. v. F & W Acq. LLC,* 891 A.2d 1032, 1058-59 (Del. Ch. 2006).

[124] *See Kronenberg,* 872 A.2d at 593. *See also MicroStrategy Inc. v. Acacia Research Corp.,* 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010) (holding that an integration clause must "contain an explicit anti-reliance representation" to preclude "fraudulent inducement based on extra-contractual statements made before the effectuation of the contract"); *Abry P'rs V, L.P,* 891 A.2d at 1058-59.

[125] *See FdG Logistics LLC,* 131 A.3d at 860 ("[T]he integration clause contained in Section 10.7 merely states in general terms that the Merger Agreement constitutes the entire agreement between the parties, and does not contain an unambiguous statement *by Buyer* disclaiming reliance on extra-contractual statements."); *Anvil Hldg. Corp. v. Iron Acq. Co.,* 2013 WL 2249655, at *8 (Del. Ch. May 17, 2013).

representation directly conflicts with the subsequently executed agreement.[126]

While the Court refused to find the Supply Agreement required Chemours to source off-site chlorine, it is clear in that Chlorine Price was defined in contemplation of an arrangement involving delivery of chlorine to Chemours from off-site suppliers for which freight charges would be incurred. Also absent from this case is a detailed "exclusive representations and warranties" provision. Ultimately, the Court cannot find at this stage in the litigation that the Supply Agreement's integration clause sufficiently precludes ATI's fraud claim.

While the Court will not dismiss the fraud claim at this juncture of the litigation, it does express significant reservations regarding the merit of this claim. The alleged statements that form the basis of the claim occurred during the negotiations in 2006 which ultimately led to the execution of the contract. To prove this claim, ATI will need to establish that the statements were false when made in 2006 or made with reckless indifference to its truth. The fact that Chemours subsequently made a different business decision years later does not establish an inference that the statement was false when made. Further, an

---

[126] *See Black Horse Capital, LP v. Xstelos Hldgs., Inc.*, 2014 WL 5025926, at *26 (Del. Ch. Sept. 30, 2014) (refusing to fine justifiable reliance where contract included integration clause, emphasizing "how directly and completely the terms of the alleged Serenity Agreement conflict[ed] with the plain language of the Acquisition Agreements…"). *See also TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *9 (Del. Super. Sept. 25, 2015).

admission that an on-site facility would be built during the contract term does not necessarily make the " construction" representation false. While the Court appreciates and understands that litigation strategy and dynamics caused counsel to include this assertion, establishing in essence that representatives of Chemours lied to ATI with the intent to mislead it into executing the Supply Agreement presents significant hurdles. Counsel needs to stop posturing the litigation and be realistic as to what can be established. This is not a difficult litigation to settle if the parties would simply step back and calculate what is fair and reasonable.

## IV. CONCLUSION

For the reasons set forth above, Chemours' Motion for Judgment on the Pleadings is denied.

IT IS SO ORDERED.

Judge William C. Carpenter, Jr.